COMMODITY TRADERS, INC., A NEBRASKA CORPORATION, APPELLEE, V. KAY PALMER, APPELLANT.

280 N. W. 2d 49

Filed June 12, 1979.    No. 42098.

Terry M. Anderson and David S. Lathrop of Lathrop, Albracht & Swenson, for appellant.

James M. Woodruff and Ephraim L. Marks of Marks, Clare, Hopkins & Rauth, for appellee.

Heard before KRIVOSHA, C. J., McCOWN, and WHITE, JJ., and KORTUM and FAHRNBRUCH, District Judges.

FAHRNBRUCH, District Judge.

Plaintiff, Commodity Traders, Inc., brought an action against the defendant-appellant, Kay Palmer, to recover money advanced to an exchange clearinghouse to cover losses in Palmer's account by reason of Palmer's trading in futures contracts and for commissions earned. Trial was to the court, a jury having been waived, and judgment in favor of the plaintiff in the sum of $20,236.94 was entered. We affirm.

Prior to trading in futures contracts through plaintiff, defendant executed a "Commodity Signature Card" and a futures account letter.

On the commodity signature card defendant acknowledged that all transactions executed for his account would be subject to the rules and customs of the commodity exchange, that defendant would keep plaintiff secure against fluctuations of the market price of the commodities in his account, and that "in case of my failure to maintain with you at all times such margin as you may deem adequate for your protection, you may, without prior demand or notice to me, Sell and/or Purchase such commodities as you may consider necessary to fully protect my account."

In the futures account letter, defendant stated that

his futures account with plaintiff would be used for speculating, and it would be subject to speculating margin and to other regulations as prescribed for speculating accounts by the Chicago Board of Trade.

The same day the defendant executed the commodity signature card and the futures account letter, he began trading in futures contracts. A "futures contract" is a contract made on an exchange for the purchase or sale of any commodity for delivery at a future time. Basically, there are two types of accounts, a "hedging account" and a "speculating account." In each type of account, the trader must deposit with the broker a specified amount of money which is a predetermined percentage of the consideration for the futures contract. Because a "hedging" trader has the commodity on hand in which he is trading, the amount of money he must deposit is approximately 50 percent of the amount that the speculating trader would be required to deposit with the broker.

Between April 23, 1976, and June 22, 1976, defendant engaged in a substantial number of futures transactions. Until the final sales on June 22, 1976, each transaction was initiated by the defendant. At times, during fluctuations in the commodity market, defendant was undermargined. When this was brought to his attention, defendant deposited additional money with the plaintiff. For approximately 3 days prior to June 22, 1976, plaintiff's employee attempted to contact defendant due to defendant's precarious position in the market. Being unable to locate defendant, plaintiff on June 22, 1976, liquidated defendant's position, which resulted in a loss to defendant in the amount of $18,445. The difference between that figure and the amount of the judgment is prejudgment interest. Plaintiff paid the amount of defendant's losses to the clearinghouse through which it was operating and thereafter made demand upon the defendant for reimbursement. Defendant failed

and refused to reimburse plaintiff.

At time of trial, defendant primarily raised two defenses: (1) That plaintiff had illegally "churned" his account to generate extra commissions; and (2) that the claim of the plaintiff was based on an illegal wagering contract under section 28-954, R. R. S. 1943. The trial court found that plaintiff was entitled to recover commissions and other sums paid out on defendant's behalf and further found that section 28-954, R. R. S. 1943, was not applicable to this case.

Defendant assigns only one error in his appeal: "The Court below erred in finding Section 28-954 R. R. S. Neb. inapplicable to the present case."

Section 28-954, R. R. S. 1943, was in full force and effect at all times relevant hereto, but has since been repealed. Such statute provided in substance that anyone who in any way is connected with a bucket shop, including patrons, is guilty of a felony. The statute further provides: "A bucket shop is defined to be an office, store, board of trade room, or other place wherein the proprietor or keeper thereof or other person or agent, either in his or its own behalf or as an agent or correspondent of any other person, corporation, association or copartnership within or without the state, conducts the business of making or offering to make contracts, agreements, trades or transactions respecting the purchase, or purchase and sale, of any stocks, grains, provisions, cotton or other commodity or personal property, wherein such proprietor or keeper or patron contemplates or intends that the contracts, agreements, trades or transactions shall be, or may be, closed, adjusted or settled according to or upon the basis of the market quotations or prices made on any board of trade or exchange where there is competitive buying and selling, and upon which the commodities or securities referred to in such contracts, agreements, trades or transactions are dealt in, *and without a bona fide transaction on such board of trade*;

* * *." (Emphasis supplied.)

In the case at bar each transaction was a bona fide transaction on a board of trade and such definition does not apply to the case at bar.

A "bucket shop" is further defined by the statutes: "* * * or wherein such keeper, proprietor or patron shall contemplate or intend that such contracts, agreements, trades or transactions shall be or may be deemed closed or terminated, when the market quotations of prices made on such board of trade or exchange for the articles or securities named in such contracts, agreements, trades or transactions shall reach a certain figure; * * *."

There is no evidence in this case to reflect that there was a predetermined figure when it was contemplated by defendant or plaintiff that the transactions would be deemed to be closed or terminated, nor was it intended that such transactions would be deemed to be closed or terminated when the market quotations reached a predetermined figure.

A "bucket shop" is further defined by the statute: "* * * and also any office, store or other place where the keeper, person or agent or proprietor thereof, either in his or its own behalf, or as an agent as aforesaid therein, makes or offers to make, with others, contracts, trades or transactions for the purchase or sale of any such commodity, wherein either party thereto does not contemplate or intend the actual or bona fide receipt or delivery of such property, but does contemplate or intend a settlement thereof based upon differences in the price at which such property is or is claimed to be bought and sold."

Defendant testified to a silent unilateral intent not to be bound to deliver or accept commodities arising from his contracts. The credibility of defendant's testimony in that regard is for the trier of fact. Defendant agreed in writing to be bound by the rules and customs of the Chicago Mercantile Exchange

and the Chicago Board of Trade. Those rules and customs require that a seller deliver and that a buyer accept delivery of the commodity sold or bought. Furthermore, defendant testified he knew that delivery of a commodity would occur unless he or the broker did something about it. Defendant was reminded of that cold reality each time he received an invoice. On the back of such invoice, it is stated: "It is understood and agreed that all futures transactions made by us for your account are either hedges *or contemplate actual delivery and receipt of the property and payment therefor*; and that all property sold for your account is sold upon the representation that you have the same in your possession actually or potentially." (Emphasis supplied.)

Defendant was not a novice in the commodities market. He had traded in commodities for several years prior to his contract with the plaintiff. He knew the rules of both the Chicago Mercantile Exchange and the rules and regulations of the Board of Trade of the city of Chicago. As a matter of fact, he had relied upon those rules and regulations in a previous lawsuit to defeat the claim of another broker. First Mid America, Inc. v. Palmer, 197 Neb. 224, 248 N. W. 2d 30. He had visited the floor of the commodities market in Chicago.

Defendant testified he did not read the documents he signed at plaintiff's office. In this state, in the absence of fraud, one who does not read a contract before signing it cannot later relieve himself of its burdens. Abbott v. Abbott, 188 Neb. 61, 195 N. W. 2d 204. No fraud was proven here.

Defendant testified he had no facilities for accepting or delivering the commodities called for in his contracts. Under those circumstances, the rules and regulations of the Exchange and the Board of Trade provide the necessary facilities.

Several Nebraska cases are cited by defendant in support of his contention that this case is covered by

the "bucket shop" act. In none of those cases were all of the rules and regulations of the Board of Trade of the city of Chicago and the rules of the Chicago Mercantile Exchange as they existed at the time of the transactions here considered by the court or introduced in evidence. In this case, they are an integral part of the contract between the plaintiff and defendant and were received in evidence in their entirety. Throughout the line of cases cited by defendant, it has been explicitly stated or uniformly held by inference that a bona fide contract for future delivery of goods is a legally enforceable contract where the parties contemplate actual delivery. The "bucket shop" act deals with "pretended purchases and sales, or contracts and agreements for the pretended purchase and sale of the commodities * * * wherein there is, in fact, no actual purchase and sale of such commodities for or on account of the party or parties thereto * * *." § 28-955, R. R. S. 1943.

In all of the transactions of defendant there was nothing pretended about them. There was an identifiable buyer and an identifiable seller; the sales involved goods of a specified kind, quantity, and quality at a specified price; there was a specified time and place for delivery; and the contracts were legally enforceable.

Whether each of the parties at the time of entering the transactions here involved contemplated and intended delivery of commodities was a question of fact for the trier of fact. The circumstantial and direct evidence is in irreconcilable conflict on this material issue. The trial court, after weighing the evidence and the credibility of the witnesses, found adversely to the defendant. It is not the province of this court to weigh or resolve conflicts in the evidence, the credibility of witnesses, or the weight to be given to their testimony. Snay v. Snarr, 195 Neb. 375, 238 N. W. 2d 234. There was evidence in this case whereby the trial court could find that the par-

ties at the time the contracts were entered into con-templated and intended actual delivery.

The judgment of the trial court is affirmed.

AFFIRMED.